The next case called for oral argument is People x Rail Madigan v. Groll. Counsel, whenever you're ready. Thank you. May it please the court. I'm Ted Graham from Taylorville Beavers & Graham. This case is about the EPA's claim of open dumping on Groll property in Haina, which previously was a rose production facility. Both parties filed motions for summary judgment. Evidence was presented in support of the motions for summary judgment in the form of affidavits and deposition testimony. Those indicated that there were two types of allegedly offending materials at the subject site, which is about a 20-acre piece of ground on the, I guess it would be just the east side of the city of Haina. And those consisted of debris and other items that were left on the site by various people who may have been passing through there or trespassing even on the site, which I think constitutes probable litter. And then there were the remains of the rose production facilities that had previously existed on the site and been there for generations. The court found that both of those types of material on the site constituted discarded material and it granted the state's motion for summary judgment and entered a mandatory injunction. That process, I think, created two problems. The first is that the remnants of the former rose production facility at the site were really not discarded material. Now, you know, for all intents and purposes, Your Honor, we concede that the litter that was there at the site that had been left by third parties or trespassers, and it's possible that even some of it may have been left there by the girls after the operation of the rose production facility, but it consisted of tires and some white goods that had been dumped at the site, paper and things along those lines. You know, for all intents and purposes, we have conceded throughout the course of the litigation that that constituted litter and probably required some kind of cleanup. But with respect to the rose production facilities themselves, we cannot concede that. The fact of the matter is that the rose production facilities consisted of two greenhouse ranges on concrete foundations. They had greenhouses sitting on top of the concrete, which were made out of metal and glass and wood, inside the greenhouses, not attendant to the greenhouse itself, but inside the greenhouses were what have been described as planting benches, which were really planting beds that were embedded in the ground. And I don't recall how many there were in each greenhouse, but there were a number in each greenhouse. Each one had its own irrigation and drainage system attendant to it. At some point in the, I believe in the middle 1980s, one of the greenhouse structures itself blew over in a storm. That was salvaged by a third party. Those parts were all removed, and the affidavit that was provided and the deposition testimony from Mr. Grohl indicates that that material was removed in its entirety. There wasn't any of that that remained. Does that include the broken glass? There may have been broken glass on the ground, but the broken glass that was on the ground was probably broken glass that was there during the course of the operation of the greenhouse. Now there were, for instance, Your Honor, there were piles of glass on the ground, and those were glass, I don't know what you call them, but they were glass windows. They weren't broken? There were some that were not. There were some in those piles that probably were just because of the weight of the pile. But those were glass that were used to replace parts of the greenhouse when it was left. And I think what you'll read in the record when you see it is that material that was left on the site during the course of the operation of the greenhouse, there was dimensional lumber, there was plastic sheeting, there was glass, there were pieces of metal, whatever it was that was left on the site, and in this particular case there were cinders for use as road pack because the access to and from the property and between the greenhouses was cinder road. That was moved around on the site from time to time just because of the fact that the location of this property is adjacent to, for want of a better term, a low-income residential development that had a lot of people that lived in it who would trespass on the ground, create damage, be vandals. Part of the problem with the Rose Production Facility over the years was the fact that vandals would knock the windows out of it repeatedly, and they would have to have stuff to fix it with, so they would move it from place to place as they needed it. And when the Rose Production Facility ended, it was left right where it was at that time. Nobody made any effort to pick it up or move it away, they just left it there. The same thing went with whatever dimensional lumber they were using, with the plastic sheeting that they were using. I do recall that there are some bricks at the site, but I don't believe the bricks were there as a result of the Rose Production Facilities at all. But whatever was used in the course of the Rose Production was left right where it was when the facility went out of operation. The greenhouse structure itself was completely removed. Completely what? The greenhouse structure itself was completely removed. One of them blew over in a storm, and then a couple years later, the other one was taken out of operation, and somebody came by and wanted to buy it, so they sold it to them, and that person took that property and carted it away. Well, what's left then on the site, primarily, and is a major part of our concern, are the planting benches that are embedded in the ground, including the drainage and irrigation systems that are attendant to all of those. In each of those cases, Mr. Grohl believed at the time that the greenhouse went out of business that he would continue to use those for some purpose in the future, and he had ideas of putting in fruit trees or growing Christmas trees or doing all kinds of things because the soil in there is excellent soil. It had been used for years for growing roses. The problem that that causes with respect to Judge Paisley's order is that this Court had previously determined in Bliss v. EPA that in considering whether a piece of property or some offending material has been, quote, discarded, end quote, the prior use and origin of that property is an important consideration. In this particular case, the prior use and origin of the property was as a rose production facility, and it continued in that capacity even after the greenhouse was taken down. It could have been used for other things, and Mr. Grohl apparently intended that it would be. There was no intention at the time, none at least that's expressed in our record, either by the State or by Mr. Grohl, that would indicate that what was left from the production of roses on the site was ever intended to have been discarded, even up until the present time. At the present time, of course, it's overgrown. There are trees and bushes and roses and all kinds of things growing in there. But that doesn't necessarily mean that at the time it went out of production that those items would have been discarded. And there is a qualitative difference that exists, I think, between the term discarded and the term abandoned. If I were to abandon a bicycle on my property, if I take my bicycle, park it out in the backyard and leave it there for 15 or 20 years, I may, even if it rusts away, the wheels fall off of it, I may have some intention to use it even as a piece of art or something. But it hasn't been discarded. If I take that same bicycle and I throw it on the garbage pile in the back corner of my yard next to the burn pile, maybe that's evidence that the property's been discarded. But in this case, there isn't any evidence that any of that property was at any time discarded. And that creates a problem. Let me ask you this. It hadn't operated since 1992, right? And then there was obviously debris by the photographs left. But you're saying that's all that was the result of closing down the Rose facility. It depends on what debris we're referring to. You're saying that there was no open dumping. There was no open dumping, which is kind of my next step in the process. I don't, whatever was left there. Some of the planning benches degraded, maybe. People maybe went in there and bashed some of them up. And the testimony that was elicited at the remedy phase of this proceeding was that the photographs that have been identified, evidence may be 10% or maybe even less than 10% of the entire site, and the rest of the site looks just as it did, albeit the trees, when the Rose production facility stopped. So the first question that we have to answer is, was any of that property discarded? I'll admit that it was property, there's material there that was discarded. But it doesn't result from the Rose production facility. As for the Rose production facility, the intention was always to leave it exactly as it was in the hope that they could use it for some other purpose in the future. And as I mentioned a minute ago, I think there is a qualitative difference from whether a piece of property has been abandoned and whether it's been discarded. So at least as to that property, I think the court was incorrect when it made its determination that the property had been discarded. But that leads us to the next step in the inquiry, even if we can determine that just the lack of use causes it to be discarded under the law. And I don't think that's what this court intended in the Jerry Russell Bliss case. But even if lack of use over the years results in it being discarded, the next question in that process is, does it result from open dumping? Now, the law does define the term open dumping, but the words themselves are pretty descriptive. That something has been discarded intentionally on a piece of property. And the description that's provided in the law and is interpreted by this court at EPA versus the Pollution Control Court is that open dumping is the consolidation of waste from one or more sources on a piece of property that doesn't constitute the requirements of a sanitary landfill. Well, none of that property was ever consolidated. None of that material was ever consolidated, using that term. I suppose the word consolidated can have a broad meaning, but the fact of the matter is, it stayed there. It was never moved. It was never interfered with. It always was anticipated to have future use. And so it's not as though some of it was taken and put in a pile or moved to a different part of the property or as happened in the EPA versus Pollution Control Board case. It wasn't taken down, stuck somewhere, and attempted to be burned. This property just sits. It just remains exactly as it was when it was in its prior use. And under that case, the EPA versus Pollution Control Board, there has not been either any demolition or any disposal. And I think what this Court decided in that case is in the event of a demolition and disposal, the question that we have to ask is, what happened when we disposed of the property? Did we dispose of it appropriately? Now, the greenhouse structures themselves, they were disposed of in their entirety. They were demolished and disposed of in their entirety, and that's the evidence. So the problem that results from all of this is, on the State's motion for summary judgment, there isn't any evidence presented that indicates the prior use and origin of the property that was suggested as offending the statute, and there isn't any evidence that there was any consolidation of that property as would satisfy the open dumping requirement. And in that case, Judge Paisley's order, determining that there was resulting debris at the site which had been discarded, meaning the remnants of the prior rose production facility, would be incorrect. And at the very worst, both motions for summary judgment should have been denied because an obvious question of fact would have existed in the record. Or at the very best, Mr. Grohl's motion for summary judgment should have been granted because his evidence was the only evidence of either the prior use and origin of the property or the manner in which it went out of production at a later time. The other issue that comes up as a result of Judge Paisley's order is that a mandatory injunction, which is what's ordered in this case, was never pleaded in this matter. It first showed up in a memorandum that was filed in support of a motion for summary judgment, and, in fact, the motion for summary judgment was never filed in the case. The memorandum was eventually taken as that motion. And I suspect that the history behind the prayer for relief in the complaint is the fact that in 2005, I think, the State v. Agpro case was finally decided by the Supreme Court which said that the prior iteration of the statute did not allow for the issuance of a mandatory injunction requiring the remediation of any kind of injury to property that had been caused in violation of EPA law. The legislature amended that statute then in July of 2004 to allow for, at least arguably, to allow for the court to enter a mandatory injunction to require remediation of property where there's some offending material kept. The complaint in our case, though, was filed in October of 2005, which was 14, 15 months after the statute was amended. And if I'm to surmise, what probably happened, I suppose, what they did was they used a form complaint similar to one that they've used in the past. It had allegations in it and a prayer for relief in it passed under the prior iteration of the statute, and nobody probably paid any attention to the fact that it didn't request a mandatory injunction. When the complaint was served on us and when we defended the matter, though, the statute did allow for that remedy, and it was specifically of concern to us that the State did not request that particular remedy. And we defended the case all during 2000 and after October 2005 all the way up until the time that the motions for summary judgment were decided in 2009 on the authority that the State had given us where its prayer for relief requested a permanent injunction requiring us not to further damage the property and a complaint for money damages and attorney fees. We have consented all along that there wouldn't be any further damage to the property as a result of the accumulation of litter or the operation of the rose production facility, which went out of business 20-some years ago. We've conceded that. We did argue strenuously during the course of the process whether or not there should be a monetary fine levy, and we contested their right to receive, its right to have attorney fees as a remedy very strongly during that process. But at no time until we got around to deciding the motion for summary judgment did we ever get to an issue as to whether or not there should be any form of mandatory injunction. Let me ask you a question about this Court's finding about waste. I thought that you said in your brief that previously all waste required by the EPA had been removed. I thought you said that at page 6. But let's say that you said that. These photographs clearly show that there was still discarded material there from the rose production facility. Some of those photographs were taken prior to that time. Some were taken subsequently. And what we were referring to was that prior to the time the lawsuit was filed, the EPA came out and said you've got to remove this stuff, and there were white goods and tires and some other things there. My client hired a salvage company, an excavation company to go out, and they actually removed all of those items. And that is identified in the reports that the EPA subsequently sent. So you're saying the stuff that was left was from the rose production facility, so it was not discarded material and therefore not waste under Jerry Russell Bliss? I mean, I don't get this because if it stayed there and it kept getting worse and worse in condition and it wasn't removed, how is it not waste? Well, it wasn't discarded material. The stuff that we talked about on page 6 of the brief were specific items that the EPA came along and said had to be removed, and it didn't include anything relative to the operation of that rose production facility. So our position with respect to the rose production facility is it was never discarded material, and the definition in the statute is that waste is, among other things, discarded material that's left over from the operation. So they were going to use it in the future? It could be. I mean, how long do you get to go in the future before you have to remove this? Well, that's obviously a good question. But I think the way the Jerry Russell Bliss case is written and the way the statute is written, the operating time for determining whether or not something is discarded material or not is at the time the use of it stops. And the question has to be at that time, at that point in time, what's anticipated? Is it anticipated that that's going to be disposed of in some way? In which case? And does the evidence support that? In which case it probably is discarded material. But if the evidence doesn't support that and the use of the property is intended to be something into the future, at least at the point that the use was terminated, the material hasn't been discarded. And if it hasn't been discarded or there's no evidence that it's been discarded, then it cannot constitute waste under the statute. The thing that concerns me and concerns my client, aside from the fact that it cost him a lot, a lot of money to have to remove the rose production facility, is that that definition, and that's why I said I think there's a qualitative difference between whether something's abandoned or whether it's discarded, that definition of waste that allows the EPA to take the position that anything that's been abandoned for some period of time, whether it's a few minutes or a number of years, allows the EPA way too much control over our lives. As I drove down here today, I observed all kinds of abandoned barns. Yesterday I drove up Illinois 54 on the way to a retreat that I had to participate in, and I saw at least three or four completely abandoned houses. Coming down 55 today, just north of Litchfield, there's a red fire truck parked on the west side of Interstate 55, in the weeds, completely overgrown with trees growing through it. Now, I don't know why the thing is there. Frankly, I guess I just don't care. But somebody owns the property, somebody owns that truck, somebody owns those houses, somebody owns those barns,  But if you use the definition of the term waste or discarded material that the EPA wants to impose on us here, the EPA has the right to go into all of those things and require that they be removed. Let's move from abandonment to waste. Do you think that you can allow open dumping by failing to prevent it? I think you can, and I think that's what we've conceded all along. What my client did here was, the property is not terribly accessible. I mean, there's a concrete wall around part of it. There's a cinder ingress and egress that comes in off of Washington Street that has two posts on either side of it. It's about wide enough to drive a semi-tractor truck through. And there's two concrete posts, if I could just finish that response, right? Sure. On either side, he hung a chain on it with a no trespassing sign. Does that keep people from coming in and putting stuff on the ground? I don't know. Is it sufficient? I don't know. But I think we've conceded that if there is that property there, that material there, that it probably should be remediated. Thank you. Thank you, counsel. Counsel? We'll grant you an extra minute or two if you need to respond. Good morning, Your Honors. On behalf of the people, the circuit court here correctly found that the defendant was in violation of the act because all of the elements causing or allowing the open dumping of waste were satisfied here. The defendant – Are you only arguing that causing or allowing dumping of waste part and not the rest? No, I'm saying that all of the elements are satisfied and there hasn't been a causing or allowing is effectively conceded here today. The defendant suggests, well, these materials weren't waste and they weren't open dumped, and he confines the argument. Well, he's talking – his is about the rose production facility. Yes. The others, I don't think there's an – is there an argument about the tars? He's not arguing about the others. The tars? So I'm going to address the remains of the rose growing facility. Not the tars and whatever.  Was there paper? That is also waste that was open dumped there, but the defendant conceded it. By trespassers, as alleged. If it was dumped by – that doesn't – he alleges that those materials were dumped by trespassers. And if they were, is that a duty – his duty then to – Yes, because under the definition of allowing – That means you have to stand with a guard or something? No, but allowing is a broad term that imposes a duty. Allowing just means it doesn't require any knowledge that someone is – How could you allow something if you didn't know about it? Well, as allowing has been interpreted under the Act, and there's an Illinois Supreme Court decision about this called People v. Fiorini. There are decisions that apply allowing under the Act, and this is all cited in the brief. Allowing simply means that this is occurring on your property and that you have the ability to take some corrective or preventive action. Allowing is a very broad term as it's been construed under the Act, and that's all very well established. The defendant today is not really challenging that part of the order. But as to the third-party general refuse left by trespassers, there's no question that that's a violation of the Act. So if you own a farm and you don't go out there for a while and somebody dumps on it, because you're allowing it and you're guilty under the EPA and you could be told to remove it. Under the definition of allowing, if people are dumping waste on your property and you are not doing anything about that, then yes, you are allowing that waste to be dumped. Because you don't know about it. You do not have to know about it. There's a duty to see what's going on on your property under the definition of allowing. You didn't have to know about it. You didn't have to intend it. And this is all very well established. But if you're leasing the property to someone else to farm, do you still own it and then you're under that case law that you're citing? Well, I think if you're leasing it to someone else, then you have to also look at what the lessor might have known. So he's allowing or you're allowing? Pardon me? Okay. You own some property and you farm it thirds and two-thirds. Somebody dumps on it. Who's the IEPA going to cite? The owner of the property or the one that is getting the two-thirds and the one-third? The person who has dumped the waste. In this case, there's trespassers who are gone. I mean, they certainly are responsible for dumping waste as well. Yeah, but you're not going to catch them. But the owner here is allowing that waste to be open dumped. Allowing is part of the statute, and it is well established. Because he gets one-third of the crops and the other guy gets two-thirds and plants it and farms it. That's what I don't understand. That's not the facts here. Yeah, I know. That is not the facts here. With respect to the third-party wastes that were dumped by trespassers, there's no question under the statute that allowing took place here. Within the definition of how allowing has been interpreted by the Illinois Supreme Court and the definitions that apply allowing under the Act, you're really just looking at is this occurring on a property that's under your control, which was the case here, and you're looking at is there an ability to take some corrective action, which there was here. The defendant hasn't even raised that part of the award today. So that's a violation of the Act. With respect to the other materials, the remnants of the rose growing facility, the defendant suggests that those materials are not waste because they're not discarded material, and that's incorrect. The materials are discarded. There are pictures of what we're talking about in the investigative reports that are part of the summary judgment motion. There are many, many pictures, and I put some of those in the appendix of the brief. And so what we're looking at are materials, they're discarded materials that are left over from commercial operations, and therefore they are waste. Those materials, factually, the defendant hasn't described the facts accurately, saying that all of the materials from the greenhouse structures themselves are removed. There's still materials left over from the greenhouses that were taken away. The latest range fell down in the 1970s, actually. And there's bits of broken glass, rotting wood, various debris from the structures, and then there are these transite panels which used to form the beds. Those aren't sitting there exactly pristinely as they were 40 years ago. Many of those are strewn about and broken hither and yon. But when one takes a look at those materials, what's left are things that are now not useful. They're dilapidated, they're exposed to the weather, they're overgrown with weeds. They are abandoned. They are discarded at this point. And the defendant's testimony confirms that those materials are discarded. He testified that he was never able to find a use for these remnants, and now he has no plans to do so. It doesn't even seem that a use could be found for them at this point because it has been 40 years that they've been sitting there, dilapidated and exposed to the weather. At this point, the defendant only has very occasional visits to the site. So for all practical purposes, these are abandoned materials, these are discarded materials, this is waste. And the conclusion that this is waste follows from looking at how the Illinois Supreme Court has highlighted the definition of waste. There's a case called Alternate Fuels in which the Illinois Supreme Court explains that waste, discarded material, is material that's not been returned to the economic mainstream. And this is material that is not used, doesn't have a use at this point, has been sitting there for 40 years. It hasn't been returned to the economic mainstream. Applying Alternate Fuels, there's another case called Northern Illinois Service Company in which the court recognizes that a pile of trees that were piled up in a portion of property is discarded material because those trees are just sitting there rotting. They are discarded. So the material is discarded under the definition of waste. The defendant cited to a case called Jerry Russell Bliss v. EPA, which really isn't very relevant here and doesn't show any proof deficiency. It just doesn't have much to do with the facts that we have here. In that case, under the facts there, some evidence of prior use and origin of a substance was needed. Well, the trial court cited Jerry Russell Bliss. And he did cite it to say it doesn't really have much to do with this case. In that case, one needed evidence of prior use and origin of a substance to tell if it was discarded. And what happened there was that a company was spraying oil onto some railroad yards under a road oiling contract. And the oil happened to contain a toxic substance. But there was no evidence about how that toxic substance got into the oil. So you couldn't really tell in that case that the substance was discarded. And there are other violations of the act, but you couldn't tell that the substance was discarded for purposes of open dumping of that substance. And here, well, there is evidence of the prior use and origin of the waste. We know that it used to be part of this greenhouse business. We don't need anything more than we have. We know what it was. We know where it came from. We don't need anything more than we have to now conclude that it is a discarded material. So the material is waste by any account of the definition. How do you counter that the defendant says that the property does not become a disposal site solely because the debris continues to exist? That really goes to the next part of the contention that, well, no open dumping occurred here. And the theory is, well, I didn't open dump. These materials weren't open dumped because they were just left here. They just continued to exist here, suggesting that they weren't disposed of somehow. I didn't dispose of them because I just let them continue to exist there. But that's an illogical reading of the act to suggest that no disposal occurred, to say that they weren't disposed of because they were just left there ignores the 30 to 40 years of decay and exposure and creates an illogical result. Accepting that would mean it would completely defeat the purposes of the act because it would mean that as long as waste is abandoned just where it is, you don't move it anywhere or do anything, you just drop it in its tracks, then that's somehow okay and that's not a violation. When the whole point of these protective provisions that are in the act is that waste is supposed to go to a sanitary landfill, which is not what happened here. It was just left there. So it was disposed of. We can see that from the definition of disposal, which is also a defined term in the act, and disposal is simply placing waste into or on the land in a way that it may enter the environment and be discharged into the air. Is there a case that says disposal is allowing the original waste to be left? I think that that result is actually supported by the case that the defendant cites. Bliss? No. Bliss has to do with showing something is waste, and we have that here. Bliss does not in any way suggest that we don't have waste. Okay. So the case says disposal is allowing it to stay. The disposal case that the defendant relies on, which I think supports the position that there is disposal here, is a case called EPA versus PCV, and that's a case in which the court found an open dumping violation. And in that decision, the court found that open dumping occurred when a subcontractor demolishes a building and then disposes of the debris at the same site, in that case by burning it. They demolish the buildings and then they burn the debris. And the court noted that there would also be a violation if the debris was taken somewhere else and you disposed of it there. So either way there's a violation. What that decision doesn't say, it doesn't say is if someone just demolishes these buildings, demolishes the greenhouse structures, left the rest of it, and then did nothing, they go away and they leave it there and 40 years pass, that that's somehow not disposal. That's an illogical result. You've gone away, you've left it there, you're not doing anything with it. Nothing is going to be done with it. You've disposed of it. If there were any other result, as I say, that would completely defeat the purposes of the act. So I think that the EPA versus PCB case actually supports the conclusion that there's disposal here because you don't have to take it somewhere else. Disposal can occur right at the same location. And in this case, the disposal was abandoning the material for some 40 years. So there is open dumping, as that term is understood. There's some suggestion that, well, there's no consolidation of refuse. That's straining and parsing. That's not what the statute is getting at all. First of all, here we have more than one source. There's the third-party wastes. There's the waste from the Rose Garden business. But just in the context of the Rose Garden business, you have a lot of different wastes, and they're all sitting there commingling with the earth. So you have a consolidation of refuse from one or more sources that is not disposed of in a sanitary landfill. You look at that whole open dumping definition, it's getting at, it's really getting at a prohibition on leaving junk anywhere other than a sanitary landfill. And that's what happened here. So there is open dumping here. Consolidation of refuse doesn't mean, oh, you have to stack it up in a big pile or something of that nature, which would, again, just create this illogical result and is not what the statute's getting at. How do you answer the appellant's argument about abandoned homes? I mean, if you go to the city of Chicago, it's probably full of abandoned homes. Is that, they should be taken to a sanitary landfill? That's his question, I believe. What's your answer? I think that that just presents a very different factual situation where a building on property is different than a site where there are all these different types of wastes being left there. Well, what I'm trying to get at is, you see a house that's halfway fallen down. Is that equal to the greenhouse that the top's missing? This is not a house that someone was using. This is discarded from a commercial operation, and I think qualitatively. So the foundations are not what you're calling. I think the pictures indicate like a foundation around these greenhouses. So that's not what you're talking about. I don't believe the foundations were actually included. It's all of the other waste and discarded material from the commercial operation. I mean, I'm sorry. You said included or excluded the foundations to the greenhouses. I don't actually know about the foundations of the greenhouse themselves. The reason I say that, they might be harder to remove. I don't know. That, I think, is a detail that can be worked out in the terms of remediation. But there is unquestionably a variety of debris that is there, that has been abandoned, and that has been open dumped. There's some suggestion that, well, does this mean if you put something down for a few minutes, you know, it becomes discarded material. And, you know, that's not the case at all. We're talking about a passage of 40 years. Was that alleging the complaint? I didn't read the complaint. Yes. Okay. The time has passed, so we're talking about open dumping here by human standards. There's also the suggestion that a mandatory injunction was not specifically requested in the complaint, and, therefore, the court's remedy order was somehow improper. It's our position that argument derives from Section 2604 of the Code of Civil Procedure, which provides that if relief is sought that's, well, first of all, it starts with the premise, it's okay. Seeking relief beyond what is sought in the complaint does not limit the relief requested. It's okay to do that. It does not limit the relief requested. But if relief is sought beyond that requested in the complaint, then the court is to make sure that no unfair prejudice, no surprise, unfair surprise results to the defendant. It's our position that the language of the complaint, which asked the court to enjoin further violations of the act, and it also asked the court for other relief that the court found appropriate, that that language encompasses corrective action like the remediation order. We think that that's in the complaint. But that actually doesn't matter. It's not beside the point here because if it's not in the complaint, it's perfectly okay under Section 2604. All that has to happen is the court is supposed to make sure that there's no unfair surprise. And this record as a whole shows that there was absolutely no unfair surprise about remediation order being entered. Did the trial court address that issue of surprise on the injunction? I don't recall. The court's remediation order doesn't make a specific finding about that, but implicitly it was only after a remediation hearing that the defendant said in a letter, well, the complaint doesn't say in so many words, requesting a mandatory injunction, so it shouldn't be allowed, and the court obviously had that before it and decided that a remediation order was appropriate. We can agree that saying it in a complaint makes it real clear, though, can't we? Pardon me? Saying you're seeking a mandatory injunction makes it real clear and puts the other side on notice. That makes it really clear. But here, and I see that I'm out of time, but just reading through, the record shows that remediation was sought all along. The most important thing there, I think, is there was a hearing on remediation. The people say at the beginning of the remediation hearing, our primary goal is remediation. The judge says, well, let's talk about remediation. The defendant participated in that hearing and put on evidence of remediation, so there was no unfair surprise. It's not like this came out of left field. Remediation was sought years earlier in the summary judgment motion and well before the litigation started, going back to the original violation notices of 2001-2002, before this was even in litigation, those violation notices put the defendant on notice. They take the position that the site has to be remediated, including all of the greenhouse remains. That's way back in 2001, that the defendant's being told that the greenhouse remains have to be remediated. So that is the case here, that this was well known to the defendant all along. The statutory elements are well testified in this event. Counsel, I think your time has expired. Thank you. Thank you, counsel. Counsel? Thank you, Your Honor. Just to answer your question directly, the court did not address the issue with respect to the issue on the mandatory injunction. The court's original ruling that found the liability doesn't address it, and the ruling that he made after the penalty phase of the process does not address the issue either, even though we did address it in both of the memoranda that we forwarded to him. I can also tell you that the direct answer to your question about whether there's any authority for the proposition that leaving material on the ground constitutes open dumping, there is not, not as would identify a factual situation that's in any manner similar to what we have here. What the state wants us to understand about this situation is that if a piece of property doesn't have a piece of material left on the ground, doesn't have a useful purpose, then it must have been abandoned. And if it's been abandoned, it's been discarded. And if it's been discarded, it must have resulted from open dumping. And I'd suggest to us that there are a couple of concerns there. One of them is that that analysis probably leads us down a very, very dangerous road. In the first place, if the property doesn't, who's to determine whether the property that's left on the ground has a useful purpose? Is that up to the EPA to decide? And certainly we cannot, we can't leave it in their hands. Somewhere else, somebody has to make the determination whether a property has a useful purpose when it's either discarded or abandoned. And as for our purposes in court, in a courtroom setting in front of a judge or a jury, that determination's got to be made based on what the evidence is that's presented. And the evidence is either going to support that the property's been discarded or that it's been abandoned or that it's still in use. And a jury can make that determination. But for the EPA to be allowed, and this Court's decision, since it will be, if you decide that issue, the only one on that subject, this Court's decision is going to be pretty significantly viewed in the community. Your first statement, too, I believe you said that you concede that there was dumping from waste from people that came in and littered, and they had to clean that up. Your issue is the greenhouse remnants. Our primary issue is the greenhouse remnants. And the problem with using this analysis that the State wants us to use in that situation is that the EPA shouldn't be in the position of deciding whether any of that property is of a useful purpose. We have a statute. Statutes are to be strictly construed. And the statute very specifically says what it intends to prohibit. As far as the term waste is concerned, it intends that waste consists of discarded property. And there isn't any evidence in this case that the remnants of the greenhouse facilities, the planting benches, the irrigation systems, the foundations from the original greenhouses, any of that stuff, that that was ever in any manner discarded. And the next step in that process is, of course, that the statute says that in order for something to constitute open dumping, and you can have waste anywhere as long as it's not the result of open dumping. If it's the result of open dumping, the EPA has control and jurisdiction over it. If it's not the result of open dumping, then they do not. And this complaint in this case deals exclusively with open dumping. So if there is waste on the ground, if for some reason we can determine that the remnants of the greenhouse constitute some form of waste, the next question we have to answer is whether or not there's open dumping that caused it to be there. If open dumping is the consolidation of any waste, even if we assume this is waste, there has been no consolidation of any of that. What counsel indicated to you with respect to the Pollution Control Board case is that a guy demolished a building, he tore it down, piled it up in the middle of a lot, pushed it all together, and then burned it. And the court's determination in that situation was that constituted open dumping because there was a consolidation of the waste in the middle of that lot. But we don't have any consolidation of that waste here. I'll consent that there is other waste on the property and that my client's been in the process of trying to clean it up with the assistance of the EPA for years. But we're not here to argue about that. What we're here to argue about is the fact that the trial court didn't differentiate between those things when they did it and determined, we feel arbitrarily, that what was left of the greenhouse facility constituted some kind of resulting debris. There wasn't any resulting debris from the demolition. That was all hauled away. And that's what our evidence showed. And on that case, as I mentioned before, the appropriate action by the court would either have been to deny both motions for summary judgment or to grant district roles, at least with respect to those greenhouse facilities. How long do you get to leave that discarded material for future use? As I said before, I don't know what the answer to that question is. I know that there's some pretty old discarded material around the state that's been left in a particular place that hasn't had anybody touch it. It's been there since its original use. The EPA has not identified any regulations in that regard. The legislature hasn't identified any rules in that regard. And so we don't have anything to go by. But I think it's completely inappropriate for the EPA to be the final determination on an ad hoc basis. Thank you. Thank you, counsel. We appreciate the briefs and arguments of both counsel. We'll take the case under advisement.